CHICAGO HEIGHTS VENTURE, et al., Plaintiffs-Appellants,

v.

DYNAMIT NOBEL OF AMERICA, INC., and Brown & Kerr, Inc., Defendants-Appellees.

No. 84-3087.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1985.

Decided Jan. 28, 1986.

Michael L. Childress, Karr & Valenti, Ltd., Chicago, Ill., for plaintiffs-appellants.

Marion B. Adler, Kirkland & Ellis, Chicago, Ill., for Dynamit Nobel.

Jo M. Bonell, Kiesler & Berman, Chicago, Ill., for Brown & Kerr.

Before COFFEY, EASTERBROOK, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The appellants brought this diversity action seeking compensation for property damage to two of their apartment buildings. They claimed that this damage arose out of their use of Trocal, an allegedly defective roofing material which was manufactured and installed by the appellees. In a series of five memorandum opinions, the district court dismissed six of the appellants' eight counts; judgment on the pleadings was granted in favor of the appellees on the remaining two counts. This appeal followed. After considering the arguments advanced by the appellants, we affirm.

I

FACTS AND PROCEEDINGS

Chicago Heights Venture, the principal appellant,[1] is a limited partnership with real estate holdings in suburban Chicago, Illinois. During 1974 and 1975, the partnership hired one of the appellees, Brown

---

1. There are twelve named appellants in this action. Chicago Heights Venture, the principal appellant, is a limited partnership. The other appellants are either general or limited partners. TMG Corporation and Gerald D. Gillman are general partners. The limited partners are: Bernard Klebanow, Amy S. Cohen, Richard J. Scheuer, Donald E. Peiser, Leon Meyers, Claude N. Rosenberg, Jr., Louise J. Rosenberg, Martin Bernstein, and David Schulman.

& Kerr, Inc. (B & K), to install a roof on each of two Chicago Heights apartment buildings—the Thornwood Apartments. According to the agreement, B & K was required to install Trocal roofing material.

Trocal is a plastic membrane which was designed, manufactured, sold, and distributed by Dynamit Nobel of America, Inc. (DNA), the second appellee. Unlike many other roofing materials, Trocal is "loosely laid." The plastic sheeting is affixed to the building only at the edges; it does not bind with the roof in the same way that a substance like tar binds with a roof.

The appellants' alleged damages arose out of two separate occurrences. The first incident occurred in August 1978 when Trocal tore away from the roof of each apartment building. The second incident occurred less than a year later, on April 5, 1979, when Trocal again malfunctioned. This time, instead of merely ripping apart from each building, Trocal entirely separated from the roof and fell to the ground during a windstorm. As a result of both incidents, water leaked into the buildings and damaged the ceilings and walls of the lower floors. The appellants also alleged that, during the first incident, Trocal's rip-

ping force was sufficient to loosen bricks on each building.

The appellants filed a five count diversity action on August 24, 1982. This complaint was later displaced by an eight count amended complaint which was filed on May 4, 1983. While the complaint consisted of a number of allegations—counts charging negligence, breach of warranty, fraud, and breach of contract—only four of the counts are at issue in this appeal.[2] The appellants ask us to review the district court's disposition of each:

1) Count I asserts an action for strict products liability with respect to both defendants, DNA and B & K. The district court dismissed these claims; it concluded that "Illinois law requires the conclusion that the Trocal roof is an integral part of the building structure and not a product for purposes of products liability." *Chicago Heights Venture v. Dynamit Nobel of America*, 575 F.Supp. 214, 218 (N.D.Ill. 1983) [hereinafter cited as Order]. The district judge noted that the Illinois courts had recognized that "[m]any of the policy considerations embodied by strict liability focus upon the protection of consumers, with their unequal bargaining power and lack of access to information, from accidental injuries."[3] *Id.* at 217 (footnote omit-

---

**2.** The procedural history of this case is rather complicated and requires summation before we continue. The appellants' eight count amended complaint was filed on May 4, 1983. Counts I, II, IV, and V alleged actions against both defendants, DNA and B & K. Count I was based on strict tort liability; Count II alleged negligent damage to property. Counts IV and V alleged actions based on express and implied warranty, respectively.

Counts III, VI, and VII applied to DNA alone. Count III sought recovery for willful and wanton damage to property. Count VI sought recovery for fraud, and Count VII alleged an action for breach of contract.

Finally, Count VIII alleged an action for breach of contract against B & K alone.

The district court dealt with subsets of these counts in each of its five memorandum opinions. In its order of November 21, 1983, 575 F.Supp. 214, the district court dismissed Counts III, VI, and VII and the portions of Counts I, II, and V which alleged claims against DNA. In its second order, filed March 26, 1984, the court reinstated Count VII against defendant DNA. However, in the same opinion, the court also

dismissed the portions of Counts I, II, IV, and V which alleged actions against B & K. Thus, after this second decision, the only remaining claims were Count VII (breach of contract against DNA), Count VIII (breach of contract against B & K), and the portion of Count IV alleging DNA's liability.

On July 3, 1984, the district court granted judgment on the pleadings in favor of DNA and B & K on Counts VII and VIII, respectively. On September 25, 1984, the district court denied appellants' motion to reconsider its decision regarding Count VIII. The court also denied the appellants' motion for leave to file a second amended complaint. Finally, on November 16, 1984, the district court granted the appellants' motion to dismiss without prejudice the sole outstanding claim—that portion of Count IV seeking recovery from DNA. This final action paved the way for the present appeal. Notice of appeal was timely filed on December 10, 1984.

**3.** The district court cited *Walker v. Shell Chemical, Inc.*, 101 Ill.App.3d 880, 57 Ill.Dec. 263, 428 N.E.2d 943 (1981); *Heller v. Cadral Corp.*, 84 Ill.App.3d 677, 40 Ill.Dec. 387 406 N.E.2d 88

ted).   Since the plaintiffs-appellants were "a commercial enterprise, in the business of managing apartments," *id.* at 218, these policy concerns were, in the view of the district court, inapplicable.   Additionally, noted the court, "the existence of other judicial remedies such as breach of warranty further supports our conclusion that roofing material is not a product within the ambit of the products liability doctrine." *Id.* (citing *Lowrie v. City of Evanston*, 50 Ill.App.3d 376, 384, 8 Ill.Dec. 537, 543, 365 N.E.2d 923, 929 (1977)).

2) Count II is an action against both defendants for negligent damage to property.   The district court dismissed this count on the ground that it alleged economic rather than tortious property loss.   Consequently, since Illinois law prohibits recovery of economic losses in tort, the claim had to be dismissed.   Order at 5.   (The court also noted that this conclusion provided an additional justification for the dismissal of Count I.)

3) Count III is an action for willful and wanton damage to property against DNA only.   The district judge dismissed the claim because it sought punitive damages for activities arising out of Counts I, II,

and VI.   (The latter count was also dismissed and is not part of this appeal.)

4) Count VIII asserts a claim for breach of contract against B & K only.   The district court held that the applicable statute of limitations barred this claim and granted judgment on the pleadings.

## II

### THE STATUTE OF LIMITATIONS ISSUE

At the time of the alleged damage, the Illinois statutes of limitations prescribed a five-year period for actions premised on negligent damage to property and a ten-year period for actions premised on written contracts.   *Champaign County Nursing Home v. Petry Roofing, Inc.*, 117 Ill. App.3d 76, 72 Ill.Dec. 594, 596, 452 N.E.2d 847, 849 (1983).   However, on November 29, 1979, a special statute of limitations became effective for tort or contract actions arising out of the design, planning or construction of buildings.[4]   Under this statute, litigation must commence within two (2) years of the discovery of the injury and in no event later than twelve (12) years after the occurrence of the injurious act.   As originally enacted, this statute had a savings clause which gave this new limita-

---

(1980); *Immergluck v. Ridgeview House Inc.*, 53 Ill.App.3d 472, 11 Ill.Dec. 252, 368 N.E.2d 803 (1977); *Lowrie v. City of Evanston*, 50 Ill.App.3d 376, 8 Ill.Dec. 537, 365 N.E.2d 923 (1977).

**4.**   Ill.Ann.Stat. ch. 110, § 13–214 (Smith-Hurd 1984) provides:

§ 13–214.   Construction—Design management and supervision.   As used in this Section "person" means any individual, any business or legal entity, or any body politic.

(a) Actions based upon tort, contract or otherwise against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property shall be commenced within 2 years from the time the person bringing an action, or his or her privity, knew or should reasonably have known of such act or omission.

(b) No action based upon tort, contract or otherwise may be brought against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property after 12

years have elapsed from the time of such act or omission.   However, any person who discovers such act or omission prior to expiration of 12 years from the time of such act or omission shall in no event have less than 2 years to bring an action as provided in subsection (a) of this Section.

(c) If a person otherwise entitled to bring an action could not have brought such action within the limitation periods herein solely because such person was under the age of 18 years, or developmentally disabled, or mentally ill, or imprisoned on criminal charges, the limitation periods herein shall not begin to run until the disability is removed.

(d) Subsection (b) shall not prohibit any action against a defendant who has expressly warranted or promised the improvement to real property for a longer period from being brought within that period.   ·

(e) The limitations of this Section shall not apply to causes of action arising out of fraudulent misrepresentations or to fraudulent concealment of causes of action.

tion period prospective application only. However, on September 16, 1981, the statute was re-enacted without the savings clause.

In ruling on whether this action was time-barred, the district court recognized the general rule in Illinois that, when a new and shorter statute of limitations is enacted, litigants must be given a grace period in which to file suit—a reasonable period of time to comply with the new statute's time limitations. *Balzer v. Inland Steel Co.*, 100 Ill.App.3d 1071, 56 Ill.Dec. 594, 427 N.E.2d 999 (1981). Nevertheless, the district court believed that, under the circumstances presented here, the new limitation would be applied by the Illinois courts. It based its opinion, successively, on two different rationales. When it first addressed the issue, it relied on an Illinois intermediate appellate court decision, *Champaign County Nursing Home v. Petry Roofing, Inc.*, 117 Ill.App.3d 76, 72 Ill.Dec. 594, 452 N.E.2d 847 (1983), and found that the legislature's repeal of the savings clause (which it found became effective July 13, 1982) amounted to a legislative determination that the grace period had ended. Later, in denying a motion to reconsider, it held that the statute was first applicable to this case on September 16, 1981, the date it was re-enacted without the savings clause. The issue then became whether the plaintiffs had a reasonable period of time to file suit. The district court held that the plaintiffs were barred because they did not file their claim until eleven months later. The court noted that, in a similar case involving the same statute, an intermediate appellate court in Illinois had found a delay of nine

months unreasonable. *Matayka v. Melia*, 119 Ill.App.3d 221, 74 Ill.Dec. 851, 456 N.E.2d 353 (1983).

We believe that the district court properly dismissed the count. The alternative analysis, adopted by the district court on reconsideration, and set out immediately above, is, in our view, the correct one. It was not reasonable for the plaintiffs to wait eleven months after the repeal of the savings clause in the statute of limitations.[5]

In their brief, appellants frankly admit that "resolution of this issue could be dispositive of the entire matter were this court to find against Plaintiffs on this issue." Appellants' Br. at 6. Appellee B & K also submits—albeit in conclusory fashion—that the same statute of limitation ought to apply to Counts I and II, sounding in strict tort liability and negligence, respectively. However, the district court did not rely on this ground in dismissing these claims, perhaps because it was not raised by the parties. While we are at a loss to understand why this matter was not raised and litigated below, we must, at this point, dispose of the case on the grounds actually considered by the district court.

## III

### ECONOMIC LOSS

The district court dismissed Count II, the negligence count, because the complaint alleged only economic loss which, under the law of Illinois, is not recoverable in a tort action.[6] The district judge relied on the decision of the Supreme Court of Illinois in *Moorman Manufacturing Company v.*

---

5. Illinois undertook to recodify its statutes in the Code of Civil Procedure. That recodification became effective on July 1, 1982. In this recodification, the savings clause reappeared in the statute. However, only twelve days later, on July 13, 1982, the savings clause was deleted from the code version. We do not believe that this twelve day "revival" of the savings provision in July 1982 during the recodification process is of any significance. The appellants had already waited an unreasonably long period of time before this situation occurred. Moreover, they make no showing of reliance on this tortuous technicality.

The appellants also submit that it would be unjust to apply the statute of limitations to bar this action because, prior to its filing, the parties had actively pursued a negotiated settlement. Private dispute resolution is certainly to be encouraged; however, its possibility certainly does not justify disregarding the legislative judgment with respect to the litigation of stale claims.

6. It noted that the same rationale could be used to support the dismissal of Count I (which it had previously dismissed on the ground that Trocal was not a "product").

*National Tank Company,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). There, the justices defined economic loss in the following terms:

> "Economic loss" has been defined as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property * * * " (Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum.L.Rev. 917, 918 (1966) (*Economic Loss*)) as well as "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." (Comment, *Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract?* 114 U.Pa.L.Rev. 539, 541 (1966).) These definitions are consistent with the policy of warranty law to protect expectations of suitability and quality.

61 Ill.Dec. at 752, 435 N.E.2d at 449.

The appellants do not dispute that, under *Moorman,* damages for economic losses are precluded in an action for tort. They dispute, however, that the losses alleged in the complaint were solely economic losses. In the appellants' view, the complaint alleges not only economic loss but property loss as well. Appellants' Br. at 19. Alternatively, they argue that the proper characterization cannot be made on judgment on the pleadings; rather, further inquiry at the trial level is appropriate. *Id.* at 18.

Both parties focus, to a great extent, on two post-*Moorman* decisions of the Illinois Supreme Court: *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411 441 N.E.2d 324 (1982) and *Foxcroft Townhome Owners Association v. Hoffman Rosner Corporation,* 96 Ill.2d 150, 70 Ill.Dec. 251, 449 N.E.2d 125 (1983). In *Redarowicz,* a home purchaser sued his seller upon discovering that a chimney and adjoining brick wall were beginning to pull away from the rest of the house, resulting in water leakage in the basement and roof area. The appellees find support in the court's holding. The court denied recovery on a tort theory under the authority of *Moorman:*

> We affirmed the trial court's dismissal of both the strict liability and negligence counts in *Moorman.* We concluded that a complaint alleging qualitative defects in a product does not belong in tort. A disappointed consumer of a storage tank or a disgruntled purchaser of a certain house cannot assert that, due to inferior workmanship that led to eventual deterioration, he can recover under a negligence theory in tort. We find no sound reason to treat either of the aforementioned purchasers differently from one another.

*Redarowicz,* 65 Ill.Dec. at 414, 441 N.E.2d at 327. However, note the appellants, the court limited its holding:

> This is not a case where defective construction created a hazard that resulted in a member of the plaintiff's family being struck by a falling brick from the chimney. The adjoining wall has not collapsed on and destroyed the plaintiff's living room furniture. The plaintiff is seeking damages for the costs of replacement and repair of the defective chimney, adjoining wall and patio.

*Id.* On the basis of this limiting language, the appellants submit that they:

> alleged a sudden loss and damages to other property. Plaintiffs allege that the loss occurred due to a windstorm. (R–53, Supplemental A–Exhibit G). Plaintiffs further allege that loss and damage resulted to the walls of the building as well as to the TROCAL. (R–53, Supplemental A–Exhibit G). These allegations are sufficient on which to premise actions for tortious damage to property.

Appellants' Br. at 23. In reply, the appellees submit that the roof damage alleged by the plaintiffs "did not create the kinds of injuries that are so imminently hazardous to the public safety that public policy, through tort law, imposes liability on the product manufacturer irrespective of the actual bargain between the parties." Appellee DNA's Br. at 8. No other damage,

they argue, can be inferred from the plaintiffs' complaint.

■ There is, without doubt, some ambiguity in Illinois law as to what losses may form the basis of an action in tort, as opposed to contract. We believe, however, that the district court, in determining that the losses alleged in this complaint were actionable, if at all, in contract properly applied Illinois law. As noted by the Appellate Court of Illinois in *Ferentchak v. Village of Frankfort*, 121 Ill.App.3d 599, 76 Ill.Dec. 950, 459 N.E.2d 1085 (1984), *aff'd in part, rev'd in part*, 105 Ill.2d 474, 86 Ill.Dec. 443, 475 N.E.2d 822 (1985), in distinguishing between the losses which are recoverable under a tort theory and the economic losses which are recoverable under a contract theory, it is inappropriate to focus "solely on the nature of damages while ignoring the policy behind and analytical underpinnings of that opinion." 76 Ill.Dec. at 954, 459 N.E.2d at 1089. According to that court, *"Moorman's* bar to tort recovery for economic losses does not focus on a particular type of damage, so much as it identifies harm originating from a particular context, the commercial context wherein harm is to a consumer's commercial expectations." *Id.* at 955, 459 N.E.2d at 1090. The court went on to note that, in *Moorman,* the Illinois Supreme Court cited with approval the earlier decision of the Third Circuit in *Pennsylvania Glass Sand Corporation v. Caterpillar Tractor Company,* 652 F.2d 1165 (3d Cir. 1981). Indeed, it quoted the following passage from the Third Circuit's opinion:

> Although strict liability in tort developed out of the law of warranties, the courts of most states have recognized that the principles of warranty law remain the appropriate vehicle to redress a purchaser's disappointed expectations when a defect renders a product inferior or unable adequately to perform its intended function. [Citation.] These courts have classified the damages consequent to qualitative defects, such as reduced value, return of purchase price, repair and replacement, or lost profits, as economic loss, and have relegated those who suffer such commercial loss to the remedies of contract law.
>
> On the other hand, almost all courts have adopted the view that the benefit-of-the-bargain approach of warranty law is ill-suited to correct problems of hazardous products that cause physical injury. Manufacturers are better able to bear the risk or to take action to correct flaws that pose a danger. Accordingly, tort law imposes a duty on manufacturers to produce safe items, regardless of whether the ultimate impact of the hazard is on people, other property, or the product itself.

*Moorman,* 61 Ill.Dec. at 753, 435 N.E.2d at 450 (quoting *Pennsylvania Glass,* 652 F.2d at 1172–73).[7]

---

**7.** At an earlier point, the *Moorman* court addressed the same policy concerns more precisely in justifying the exclusion of economic loss from recovery in product liability tort cases and in negligence actions. Exclusion of economic loss from recovery in product liability cases, said the *Moorman* court:

> comports with the notion that the essence of a product liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property. On the other hand, contract law, which protects expectation interests, provides the proper standard when a qualitative defect is involved, *i.e.,* when a product is unfit for its intended use.

61 Ill.Dec. at 751, 435 N.E.2d at 448. The same concerns, continued the court, apply to negligence actions:

> The policy considerations against allowing recovery for solely economic loss in strict liability cases apply to negligence actions as well. When the defect is of a qualitative nature and the harm relates to the consumer's expectation that a product is of a particular quality so that it is fit for ordinary use, contract, rather than tort, law provides the appropriate set of rules for recovery. Moreover, as was true with strict liability, if a manufacturer were held liable in negligence for the commercial loss suffered by a particular purchaser, it would be liable for business losses of other purchasers caused by the failure of its product to meet the specific needs of their business, even though the needs were communicated only to the dealer.

*Id.* at 754, 435 N.E.2d at 451 (citation omitted).

In the case before us, the district court's task was to determine whether Illinois courts would, in applying the foregoing policy concerns, determine that this alleged loss could be fairly characterized as grounded in the "safety-insurance policy of tort law" rather than the "expectation-bargain protection policy" of contracts. *Id.* In our view, the district court reached the correct result. Indeed, in *Moorman,* the Illinois Supreme Court cited with approval another Third Circuit opinion in which that court attempted to predict, without the guidance of *Moorman,* the future trend of Illinois decisions. That case, *Jones & Laughlin Steel Corporation v. Johns-Manville Sales Corporation,* 626 F.2d 280 (3d Cir.1980), presented a fact situation not unlike the one in this case. The plaintiff sought damages caused by a faulty roof installed by the defendants. Shortly after its installation, the roof began to blister, wrinkle, and crack. The cracks permitted water to enter the steel mill, which in turn damaged some of the steel products under construction and also caused electrical outages. The court, grounding its decision in the same policy determinations which were to later govern the decision in *Moorman,* found that the alleged loss was economic in nature:

> The original purchaser, particularly a large company such as Jones & Laughlin, can protect itself against the risk of unsatisfactory performance by bargaining for a warranty. Alternatively, it may choose to forego warranty protection in favor of a lower purchase price for the product. Subsequent purchasers may do likewise in bargaining over the price of the product. In any event, because persons other than the owner of the product will not incur economic losses resulting from the product's poor performance, the costs associated with economic loss will likely be reflected in the price of the product. There accordingly would seem to be no need to internalize these costs through a non-price mechanism such as strict liability.

*Id.* at 288–89.

The present case is distinguishable from *Jones & Laughlin* in one respect. There, the company did not seek damages for any injury to property other than the roof itself. Here, at least at this very early stage of the litigation, plaintiffs' claims can be construed—if charitably read—as asserting a claim for damage to other parts of the building caused by the lack of adequate roofing. We believe, however, that the Illinois courts would not consider this difference to be legally significant. In *Redarowicz,* the defective chimney and adjoining wall created water leakage—and consequent damage—in the basement and roof area. The Illinois court had no difficulty, · however, in applying the holding of *Moorman* and deciding that the claim was one for economic loss. The *Redarowicz* court held that recovery for deterioration alone, caused by latent structural defects, was not actionable in tort. "[W]here mere deterioration or loss of bargain is claimed, the concern is with a failure to meet some standard of *quality.* This standard of quality must be defined by reference to that which the parties have agreed upon." *Redarowicz,* 441 N.E.2d at 327 (quoting *Crowder v. Vandendeale,* 564 S.W.2d 879 (Mo.1978) (emphasis in original)).

While the final manifestation of the defect (the roofs' falling to the ground in a windstorm) may have been dramatic, it can hardly transform the deterioration alleged throughout the complaint into a "sudden and calamitous damage." *Moorman,* 61 Ill.Dec. at 752, 435 N.E.2d at 449. Fairly read, the complaint alleges a malfunction over time which necessarily, given the nature of the product, manifested itself most acutely in times of adverse weather. Since it was necessarily attached to the structure, its malfunction necessarily caused incidental damage to the surrounding parts of the structure. The gravamen of the complaint—simply stated—is that the roof did not work. The district judge properly viewed such an allegation as a matter of economic loss, the result of a qualitative defect which reduced "the consumer's expectation that a product is of a particular quality so that it is fit for ordinary use...." *Id.* at 754, 435 N.E.2d at 451.

## CONCLUSION

■ The district court properly dismissed Count VIII on the ground that it was barred by the statute of limitations. Counts I and II were properly dismissed since, under Illinois law, they allege only economic loss and therefore cannot constitute the basis of a tort claim.[8] Count III was properly dismissed since it is derivative of Counts I and II.

Accordingly, the judgment of the district court is

AFFIRMED.

---

**8.** The district court also held that Trocal was not a "product" for purposes of a product liability action. Since we have already determined that the district court correctly dismissed Counts I and II (and therefore the derivative count claiming punitive damages) on the ground that they sought damages for economic loss, we need not address this alternative ground for dismissing Count I, the products liability count. We do note in passing, however, that the district court was correct on this ground as well.

It seems clear that, in Illinois, whether an article is "attached" to real estate is not the ultimate test. *Trent v. Brasch Manufacturing Co.,* 132 Ill.App.3d 586, 87 Ill.Dec. 784, 789, 477 N.E.2d 1312, 1317 (1985). Indeed, a defective item associated with a building may give rise to a product liability action *if* the "item has not become an indivisible component part of the building or structure." *Boddie v. Litton Unit Handling Systems,* 118 Ill.App.3d 520, 74 Ill.Dec. 112, 118, 455 N.E.2d 142, 148 (1983) (conveyer installed in building deemed a "product"). However, we see no possibility that the plaintiff could establish that this roofing component was not an "indivisible part of the building structure itself, such as the bricks, supporting beams and railings." *Id.* 74 Ill.Dec. at 119, 455 N.E.2d at 149.