Reuel J. FOREMAN and Evelyn
M. Foreman, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 15–89T.

United States Claims Court.

May 29, 1992.

Arthur E. Spooner, Jr., Houston, Texas, for plaintiffs. James T. Karna, Melton E. Knotts, Jr., H. Stewart Dunn, Jr., and Nora A. Bailey, Washington D.C., of counsel.

Jennifer Dover Spriggs, Washington, D.C., with whom was Asst. Atty. Gen. Shirley D. Peterson, for defendant.

## OPINION

WEINSTEIN, Judge.

Before the court is plaintiffs' response to the court's *sua sponte* order to show cause why this case should not be dismissed for lack of jurisdiction, because the statutory provision, as well as the regulations, upon which plaintiffs' claim for refund is based—§ 11(c)(1) of Pub.L. No. 87–834 (1962) (1962 Act) and Treas.Reg. § 1.911–1(c), 28 Fed.Reg. 7247 (1963)—were not in effect during 1982, the year for which they claim a refund.[1]

While a decision on the merits of the parties' cross-motions for summary judgment also would result in dismissal of plaintiff's claim,[2] the court may not reach or decide the merits if it lacks subject matter jurisdiction. *UNR Indus. Inc. v. United States*, 962 F.2d 1013, 1023 (Fed.Cir. 1992) (citing *Christianson v. Colt Indus. Oper. Corp.*, 486 U.S. 800, 818, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988)).

Plaintiffs' response argues that § 11(c)(1), the effective date provision (also known and referred to herein as the "grandfather clause" or "savings clause") of the 1962 Act, is still in effect because it was not expressly repealed by § 111 of the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, 95 Stat. 172 (1981 Act). Plaintiffs contend that § 111 "only" repealed and amended § 11(a) of the 1962 Act—the substantive provision amending, by substitution, § 911 of the Internal Revenue Code of 1954, Pub.L. No. 591, ch. 736, 68A Stat. 288.[3] (The new I.R.C. § 911 enacted by § 11(a) in 1962 for the first time placed a dollar cap on the formerly unlimited exclusion from gross income allowed for foreign earned income, and instituted new limitations on the availability of the exclusion.)

As evidence of congressional "intent" not to repeal § 11(c)(1) of the 1962 Act, plaintiffs rely, not on the 1981 Act itself,

---

1. "A party seeking the exercise of jurisdiction in its favor has the burden of establishing that such jurisdiction exists." *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991) (citing *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278, 57 S.Ct. 197, 200, 81 L.Ed. 183 (1936)); *see infra* note 6.

2. The grounds for a dismissal on the merits would be plaintiffs' failure to allege evidentiary facts sufficient to support a finding as to any one of *three* essential elements of their claim: (1) that the Aramco company manual allowing moving expenses to certain senior employees applied to Reuel Foreman or someone in his position on March 12, 1962; (2) that the amount to which he claimed entitlement was "fixed" or "determinable" as required by the allegedly applicable regulations; and (3) that the full moving expense reimbursement amount he received was compensation for pre–1963 services, as required by the grandfather clause and not for services rendered by Mr. Foreman between 1963 and 1982, in light of the fact that the total amounts to be paid were committed to the full discretion of company officials and limited merely by their unreviewable determinations of "reasonableness."

3. Internal Revenue Code (I.R.C.) sections refer to sections of the United States Code as in effect in 1982, unless otherwise dated.

but on its legislative history, and specifically, three committee reports that, in virtually identical language, stated that the 1981 Act was not intended to affect the treatment of amounts of income received after 1962 to which the taxpayer had a right on March 12, 1962, and that such amounts would "continue to be subject to § 911 of the Code as in effect before the 1962 Act."[4]

■ Defendant did not seek to respond to plaintiffs' response to the show cause order.[5]

Plaintiffs' response is based on the assumption that the evidence of congressional staff's intent in 1981 to preserve it is conclusive on the question of whether the 1962 grandfather clause was in effect in 1982.

The court concludes, however, for the reasons stated below, that § 11(c)(1) of the 1962 Act and the regulations promulgated thereunder were not in effect in 1982, the year of plaintiffs' tax return, because § 11(a) of the 1962 Act, the sole subject of the effective date provision at § 11(c)(1), was repealed in 1978 by the substitution of an entirely new foreign earned income exclusion deduction scheme, through enactment of the Foreign Earned Income Act of 1978, Pub.L. No. 95–615, 92 Stat. 3098 (1978 Act). Thereupon, § 11(c)(1) expired by its own terms and was not reenacted by

the 1981 Act—or its committee reports. Since there was no law or regulation in effect in 1982 supporting plaintiff's claim for a refund, this court must dismiss plaintiff's complaint for lack of subject matter jurisdiction under the Tucker Act. 28 U.S.C. § 1491(a)(1); *cf. Hendrix v. United States*, 219 U.S. 79, 81, 31 S.Ct. 193, 193, 55 L.Ed. 102 (1911) ("When the jurisdiction of a cause depends upon a statute, the repeal of the statute takes away the jurisdiction, and causes pending at the time fall, unless saved by provision of the statute.") (citing, *inter alia*, *United States v. Boisdore*, 49 U.S. (8 How.) 113, 12 L.Ed. 1009 (1850)); *Gurnee v. Patrick County*, 137 U.S. 141, 11 S.Ct. 34, 34 L.Ed. 601 (1890) (citing *Railroad Co. v. Grant*, 98 U.S. 398, 25 L.Ed. 231 (1878)). *See also, Johns–Manville Corp. v. United States*, 855 F.2d 1556, 1565 (Fed.Cir.1988).[6]

### Factual Background

Plaintiff Reuel Foreman was hired to work as an accountant by the Arabian American Oil Company ("Aramco") in 1952, and worked for Aramco in Saudi Arabia continuously for 30 years thereafter. He and his wife, plaintiff Evelyn Foreman, filed a joint tax return for 1982, the year at issue here. They included as income on their 1982 joint return $40,231.67 in moving

---

4. The Conference Committee Report on the 1981 Act stated that:
   [The new § 911] does not affect the treatment of amounts received since December 31, 1962, which are attributable to services performed on or before December 31, 1962, and with respect to which there existed on March 12, 1962, a right (whether forfeitable or nonforfeitable) to receive such amounts. Accordingly, these amounts will continue to be subject to section 911 as in effect before amendment by the Revenue Act of 1962.
   H.R.Conf.Rep. No. 215, 97th Cong., 1st Sess. 205 (1981), U.S.Code Cong. & Admin.News, pp. 105, 295. The parallel provisions in the House Ways and Means Committee Report, and the Joint Committee on Tax, Pub.L. No. 97–34, 47–48 (1982) are identical for all purposes relevant here. H.R. Doc. No. 201, 97th Cong., 1st Sess. 63 (1981); H.R.Doc. No. 4242, 97th Cong., 1st Sess. 63 (1981).

5. Even assuming defendant's silence indicates agreement with plaintiff's arguments in support

of jurisdiction, such agreement nonetheless cannot be treated as a waiver, since jurisdiction cannot be conferred by consent of the parties. *See, e.g., United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 513, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940); *Munro v. United States*, 303 U.S. 36, 41, 58 S.Ct. 421, 423, 82 L.Ed. 633 (1938) (government attorney "had no power to waive conditions or limitations imposed by statute in respect of suits against the United States"); *UNR Indus.*, at 1021–22 (citing *Insurance Corp. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982)).

6. This court's jurisdiction to entertain tax refund suits is based on its Tucker Act jurisdiction over claims founded upon "any Act of Congress." 28 U.S.C. § 1491(a)(1); *see United States v. Emery, Bird, Thayer Realty, Co.*, 237 U.S. 28, 31–32, 35 S.Ct. 499, 499, 59 L.Ed. 825 (1915).

and travel expense reimbursements[7] provided to them or on their behalf by Aramco in 1982, when plaintiff Reuel Foreman retired and they moved from Saudi Arabia to Surrey, England. They took the maximum exclusion from gross income permitted by § 911(b)(2) for foreign earned income received in tax years beginning in 1982—$75,000—and paid taxes on their remaining income of $107,046.61.

In 1983, plaintiffs timely filed an amended 1982 return, claiming a tax refund of $19,647.06, on the grounds that they were entitled to rely on the "grandfather clause," § 11(c)(1) of the 1962 Act, to exempt their moving and housing expenses from the statutory cap of $75,000 on exclusion of foreign earned income. Plaintiff Reuel Foreman alleged that he had a contractual right on March 12, 1962, by virtue of Aramco's prior employee relations policy, as expressed in its Industrial Relations Manual (Manual), to receive moving expenses upon retirement.

Plaintiffs' complaint in this court seeks $17,925.73, the amount ultimately disallowed by the I.R.S. The parties filed cross-motions for summary judgment that hinged on whether plaintiffs could establish certain essential elements of their claim, specifically, Mr. Foreman's "right" under the Manual, and whether the amounts of moving expense compensation he received in 1982, as required by the 1963 Treasury Regulations, were "fixed" or "determinable" on March 12, 1962. *See supra* note 2.

**7.** It is undisputed that these moving expenses must be treated as an element of 1982 gross income if they cannot be excluded under § 11(c)(1) of the 1962 Act and the regulations thereunder.

**8.** Section 11(c) provided, in pertinent part:
(c) Effective Dates.—
(1) Amendments to section 911.—The amendment made by subsection (a) shall apply to taxable years ending after September 4, 1962, but only with respect to amounts—
(A) received after March 12, 1962, which are attributable to services performed after December 31, 1962, or
(B) received after December 31, 1962, which are attributable to services performed

*Statutory and Regulatory Background*

In 1926, in order to stimulate United States foreign trade, Congress exempted from taxation all foreign earned income of U.S. citizens who established foreign residency and sold U.S. products abroad. Revenue Act of 1926, Pub.L. No. 20, § 213, 44 Stat. 26. This exclusion ultimately was amended and reenacted as § 911 of the Internal Revenue Act of 1954, Pub.L. No. 591, ch. 736, 68A Stat. 288.

Section 11(a) of the 1962 Act substituted a new foreign earned income exclusion provision for § 911 of the Code. The new § 911 for the first time placed a cap on the amount of foreign earned income that could be excluded. For individuals such as the Foremans, who had resided abroad for an uninterrupted period of more than three years, the Congress set the cap at $35,000.

However, the 1962 Act, at § 11(c)(1),[8] contained an "Effective Dates" provision that plaintiff argues acted as a savings or grandfather clause and preserved the pre-1962 unlimited exclusion by not counting toward the cap any income received in taxable years ending after September 4, 1962[9] that was attributable to services performed before 1963, provided that on March 12, 1962 the taxpayer had a "right" to receive such income. Section 11(c)(1) of the 1962 Act, unlike § 11(a), was never codified, but, rather, appears merely as an historical note explaining the 1962 amendment to § 911.

The regulations that were promulgated to implement § 911 as it had been amended by § 11(a) of the 1962 Act contained a "Rule of Application" providing that:

> on or before December 31, 1962, unless on March 12, 1962, there existed a right (whether forfeitable or nonforfeitable) to receive such amounts.

**9.** Interestingly, the "grandfather clause" in the committee reports on the 1981 Act relied on by plaintiffs, see *infra* note 1, differs from the 1962 grandfather clause since it refers to amounts received after *December 31*, 1962, "rather than to income received *in taxable years ending after September 4,* 1962." Because the year of receipt here (1982) fell long after either date, however, this discrepancy does not affect the disposition of this case.

[Such right] shall be considered to exist on March 12, 1962 if such right (whether forfeitable *or nonforfeitable*) is embodied in a contract, agreement, plan, or provision of foreign law in force on March 12, 1962, which provides for the payment of a fixed amount of compensation for services performed during a term, for the payment of an amount of compensation computed solely by reference to sales, profits, or other objectively determinable facts, or for the payment of fixed or determinable amounts which are in the nature of compensation for past services. Treas.Reg. § 1.911–1(c)(2)(a), 28 Fed.Reg. 7247 (1963).

In 1978, § 911 again was revised, by the 1978 Act, to provide a "new, more balanced approach to the taxation of United States citizens working abroad." S.Rep. No. 746, 95th Cong., 2d Sess. 6 (1978) *reprinted in* 1978 U.S.C.C.A.N. 7612, 7618.

Section 202 of the 1978 Act provided in pertinent part, as follows:

> Sec. 202.  INCOME EARNED BY INDIVIDUALS IN CERTAIN CAMPS.
>
> (a) Section 911 Exclusion.—Subsection (a) of section 911 (relating to earned income from sources without the United States) *is amended to read as follows:*
>
> (a) GENERAL RULE.—
>
> *       *       *       *       *       *

Foreign Earned Income Act of 1978, Pub.L. No. 95–615, 92 Stat. 3098 (1978 Act) (emphasis added).

The new § 911(a) enacted by the 1978 Act totally revised the previous standards for exclusion, limiting the amount to $20,-000,[10] and allowing it *only* to an individual who "because of his employment, resides in a *camp* located in a *hardship* area" and provided that the individual elected not to claim the meals and lodging exclusion of § 119 of the Code.[11]

Another major foreign earned income provision was enacted by the 1978 Act amendments.  New Code § 913 allowed deductions for various "excess foreign living costs," consisting of: a qualified cost of living differential; a hardship area deduction of up to $5,000; and "excess" housing, schooling and home leave travel expenses. I.R.C. § 913(a), (b) (1978).  Complex formulas, based on comparisons of the actual foreign costs with costs in the United States, and limited to certain percentages of total income, governed the computation of the deductible "excess" expenses.  Further, the § 913 deductions were *not* allowed to individuals electing the § 911 exclusion.

The 1978 Act effected yet another amendment to the Code as it related to foreign earned income deductions.  This amendment added to the list of moving expenses deductible under I.R.C. § 217 the moving expenses (including storage fees) associated with certain foreign moves.  However, these deductions were allowed only for expenses connected with *either* moves to a new principal place of work outside the United States by an employee, *or* moves to a new residence in the United States by retirees, or by survivors of employees who die abroad.

While the 1978 Act contained an "Effective Dates" provision, this merely made the Act applicable to taxable years beginning in 1978 and allowed an election of prior law only for tax years beginning in 1978.  The provision did not save 1962 or pre–1962 law for taxpayers with existing rights on March 12, 1962.  The 1978 Act contained no other grandfather or savings clause for foreign earned income nor any reference,

---

10.  The Senate version of the 1978 Act would have eliminated the exclusion entirely.  *See* H.R.Rep. No. 1798, 95th Cong., 2d Sess. 13 (1978) *reprinted in* 1978 U.S.C.C.A.N. 7633.

11.  I.R.C. § 119(a) (1976 & Supp. II 1978).  A "camp" was defined to "constitute[ ] standard lodging which is
    (i) provided by [and] ... for the convenience of the employer because ... such individual

renders services ... in a remote area where satisfactory housing is not available on the open market,
    (ii) located ... in the vicinity [where] ... such individual renders services, and
    (iii) furnished in a common area ... not available to the public...."
Section 202(a) of the 1978 Act (codified at I.R.C. § 911(b)(1)(B) (1976 & Supp. II 1978)).

by name or subject matter, to § 11(c)(1) of the 1962 Act.

The regulations implementing the changes under I.R.C. §§ 911 and 913 effected by the 1978 Act were first issued as temporary regulations. *See* 44 Fed.Reg. 27,079 *et seq.* (1979). These temporary regulations were accompanied by a notice stating that they "will remain in effect until superseded by final regulations under those sections," and contained no reference, by name or topic, to former Treasury regulation § 1.911–1(c) or to the grandfather clause of the 1962 Act. (Another temporary regulation under § 911, issued on December 31, 1979, dealt only with revising the definition of "camp.")

The final regulations "necessary to conform the regulations under § 911 to § 202 of the [1978 Act]," and containing "final regulations under § 913 of the Code relating to the deduction for excess foreign living costs," were issued in November, 1980. 45 Fed.Reg. 76,128 (1980). These also were devoid of any reference to grandfathering pre–1962 law, to § 11(c)(1) of the 1962 Act, or to the former regulations under § 911 of the Act implementing § 11(c)(1).

Between November 8, 1978, the date of the 1978 Act, and August 13, 1981, the date of the 1981 Act, title 26 of the United States Code Subtitle A, Subpart B–Earned Income of Citizens or Residents of the United States (containing §§ 911, 913), was amended three times. Neither of these amendments to § 911, nor the legislative history of these amendments, contained or referred to the grandfather clause, § 11(c)(1) of the 1962 Act. None of these, or the 1978 Act, contained a general savings clause. Finally, none of the regulations promulgated under the post 1978 amendments contained or referred to § 11(c)(1) of the 1962 Act or any grandfather or savings clause preserving the pre–1962 law applicable to foreign earned income.

## Discussion

The question before the court is whether the Foremans were entitled in 1982 to invoke the 1962 Act's savings or grandfather clause as the basis for this court's jurisdiction, under the Tucker Act, over their complaint.

The specific legal issues may be distilled to three: (1) whether the 1978 Act implicitly repealed § 11(a) of the 1962 Act; (2) whether, if so, § 11(c)(1) of the 1962 Act also implicitly was repealed—or expired by its own terms; and (3) whether, if the grandfather clause expired or was repealed, statements in the legislative history of the 1981 Act can be construed to have re-enacted §§ 11(a) or 11(c)(1) of the 1962 Act. The court answers the first two questions affirmatively and the third negatively.

In deciding these issues, the legislative history of the 1962 Act is irrelevant. First, the 1962 Congress obviously could have evidenced no intent on a question not before it—*i.e.*, the effect of the yet-to-be enacted 1978 and 1981 Acts. Second, one Congress cannot foreclose or limit the law-making authority of a subsequent Congress, even if it evidences an intent to do so. *Cf. District of Columbia v. John R. Thompson, Co.*, 346 U.S. 100, 106, 73 S.Ct. 1007, 1010, 97 L.Ed. 1480 (1953) (Congress has the right to "revise, alter, and revoke [law] at its discretion") (quoting *Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648, 655, 21 L.Ed. 966 (1874)). In any event, the legislative history of the 1962 Act is silent on the meaning of § 11(c)(1) of the Act.

The legislative history of the 1981 Act also is irrelevant to the question of Congress' revocatory intent in enacting the 1978 Act. It becomes relevant *only* if the court were to determine, and it does *not*, that the 1978 Act did *not* revoke the 1962 Act *and* that the 1981 Act is ambiguous on the question of whether the grandfather clause is in effect. Since the 1981 Act contains *no* provision that could be read as creating an exemption from the ceiling for foreign earned income exclusion based on 1962 rights, it is not ambiguous on this point. Therefore, the 1981 Act itself furnishes permitting springboard for this

court's consideration of the legislative history of that Act.[12]

## I. *Implied Revocation of § 11(a) of the 1962 Act*

■ One of the most venerable canons of statutory construction is that repeals of statutes by implication are strongly disfavored. *See, e.g., Traynor v. Turnage*, 485 U.S. 535, 547, 108 S.Ct. 1372, 1381, 99 L.Ed.2d 618 (1988); *United States v. Fausto*, 484 U.S. 439, 452, 108 S.Ct. 668, 676, 98 L.Ed.2d 830 (1987) (citing *Rodriguez v. United States*, 480 U.S. 522, 524, 107 S.Ct. 1391, 1392, 94 L.Ed.2d 533 (1987)); *Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 1557 (Fed.Cir.1991). Under this principle, a later statute will not be held to repeal an earlier one unless the intention to repeal is expressed clearly in the later statute. *Id.*

■ However, like most rules, this canon is not without exception. There are two venerable exceptions. One exception applies when there is a "clear repugnancy" or "irreconcilable conflict" between the earlier and later statutes. *See, e.g., Fausto*, 484 U.S. at 453, 108 S.Ct. at 676 (citing, *inter alia, Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 456–57, 65 S.Ct. 716, 725–26, 89 L.Ed. 1051 (1945)); *Randall v. Loftsgaarden*, 478 U.S. 647, 661, 106 S.Ct. 3143, 3151, 92 L.Ed.2d 525 (1986); *Carter v. Gibbs*, 883 F.2d 1563, 1566 (Fed.Cir.1989).

The other exception to this canon permits an amending act or statute to operate as a repeal, even if the amending act is *not* irreconcilable, if the "later act covers the whole situation of the earlier one and is clearly intended as a substitute"[13] and is not cumulative or explanatory, see *United States v. Borden Co.*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939); *United States v. Noce*, 268 U.S. 613, 45 S.Ct. 610, 69 L.Ed. 1116 (1925).

■ That an amendment is intended to serve as a substitute may be inferred from the statutory language: "is hereby amended so as to read as follows" and the absence of brackets calling attention to the amendments—even though the preamble may speak of the act as being "amended." *Murphy v. Utter*, 186 U.S. 95, 105–09, 22 S.Ct. 776, 780–81, 46 L.Ed. 1070 (1902) (such preamble language "is not that of an amending act, but that of a repealed and substituted act").

■ Applying these rules, it is evident that the 1978 Act revoked § 911 of the prior Code, as enacted by § 11(a) of the 1962 Act, both by substitution *and* by irreconcilability.

The 1978 Act's amendments to § 911 and to § 217, and its addition of § 913, comprehensively dealt with foreign earned income deductions, exemptions or exclusions, the subject matter of § 11(a) of the 1962 Act. The legislative history of the 1978 Act confirms that Congress intended to replace the former system for dealing with foreign earned income with an entirely different scheme. Use of the statutory language "is amended to read as follows" also is consistent with the conclusion that the 1978 amendment to § 911 was intended as a substitute for § 911(a) as enacted by § 11(a) of the 1962 Act.

Further, § 911 as enacted by the 1978 Act is totally inapplicable to the Foremans, and presumptively to many—if not most—other taxpayers who previously were entitled to an exclusion based on residence abroad *not* in a "camp." Thus, old § 911 and new § 911 are utterly irreconcilable as applied to taxpayers not residing in a "camp." Otherwise put, since the provision allowing exclusion of foreign earned income by non-camp dwellers, in the pre-1978 version of § 911(a), was *not repeated* in the 1978 amendment substituting a new § 911(a), that provision, which is the one

---

**12.** *See infra* § III for further discussion of the question of whether the 1981 Act can be read as reenacting the grandfather clause of the 1962 Act.

**13.** *Randall*, 478 U.S. at 661, 106 S.Ct. at 3152 (quoting *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976); *Carter*, 883 F.2d at 1566.

upon which plaintiffs rely here, was *repealed* by the 1978 amendment.[14]

Applying the rule of deference to an agency's regulatory interpretation of the statutes that it is entrusted by Congress to execute,[15] would yield the same conclusion, because the regulations under the Code as amended in 1978 (and all the § 911 regulations promulgated thereafter until 1982) are devoid of reference to exclusions based on foreign residence other than in a "camp." Further, although § 911 was amended several times thereafter, Congress did not restore by statute the grandfather clause rules that the regulations had eliminated. *See South Carolina v. Regan*, 465 U.S. 367, 392, 104 S.Ct. 1107, 1121, 79 L.Ed.2d 372 (1984) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 & n. 66, 102 S.Ct. 1825, 1841 & n. 66, 72 L.Ed.2d 182 (1982) (Congress deemed to have knowledge of regulations promulgated under statute and to have approved them if subsequent legislation on the subject does not revise them.)).

## II. *Implied Revocation of § 11(c)(1) of the 1962 Act*

■ Having concluded that § *11(a)* of the 1962 Act was revoked in 1978, the question arises whether this effected a revocation of, or otherwise extinguished, § *11(c)(1)* of the 1962 Act, the statutory provision upon which plaintiffs rely.

As a clause employed to restrict a repealing act (*i.e.*, the 1962 Act, repealing the formerly unlimited exclusion for foreign earned income permitted by prior law), § 11(c)(1) of the 1962 Act is a "savings clause." *See De La Rama S.S. Co. v. United States*, 344 U.S. 386, 73 S.Ct. 381, 97 L.Ed. 422 (1953); *United States v. Ship Helen*, 10 U.S. (6 Cranch) 203, 3 L.Ed. 199 (1810).

It also acts as a "proviso" or "excepting clause," since it establishes an exemption to the law in which it is contained, and thus must be strictly construed. *See Bridges v. United States*, 346 U.S. 209, 215, 73 S.Ct. 1055, 1059, 97 L.Ed. 1557 (1953) (citing *United States v. McElvain*, 272 U.S. 633, 639, 47 S.Ct. 219, 220, 71 L.Ed. 451 (1926)). *See generally* Crawford, *Statutory Construction: Interpretation of Laws*, 605–06 (1940).

Savings clauses are "subject to repeal by subsequent acts; that is, they will not save from repeal any provision whose repeal is clearly intended by the later act." *Id.* at 613–14. Thus, § 11(c)(1) cannot save from repeal § 11(a) of the 1962 Act if, as is concluded above, it was intended to be repealed in 1978.

Even when a savings clause is not mentioned in the repealing act, it too is repealed when "the powers conferred by the [repealing] act so completely annihilate the existence of every reason which led to the passage of the former act ... that it would be absurd to hold that the two acts could stand together." *Kibbe v. Ditto*, 93 U.S. 674, 678, 23 L.Ed. 1005 (1877).

Further, the very failure to reenact a savings clause has been read as a legislative determination that it was intended to be repealed. *See generally Chicago Heights Venture v. Dynamit Nobel of Am., Inc.*, 782 F.2d 723, 725–26 (7th Cir. 1986).

Finally, giving the words in the provision their ordinary and "usual" meaning, see *United States v. Stewart*, 311 U.S. 60, 63, 61 S.Ct. 102, 104, 85 L.Ed. 40 (1940), § 11(c)(1) expires or terminates by its own terms once its sole object, § 11(a), has been revoked, because § 11(c)(1) logically has no effect or meaning in the absence of § 11(a).

The apparent assumption of the drafters of the 1981 Act's legislative history—that,

---

**14.** There is no evidence in the record that the Foremans resided in a "camp" before 1981. Even so, they would not have been able to rely on such evidence in 1982, the year at issue, since § 911 again was amended by substitution, by the 1981 Act, to eliminate the camp-based exclusion and excess cost deduction format of the 1978 Act and apply an exclusion only, similar to the format of the 1962 Act.

**15.** *See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Ulmet v. United States,* 822 F.2d 1079, 1086 (Fed.Cir. 1987).

because § 11(c)(1) was not expressly revoked or substituted, it remains in effect *and* must be read to incorporate or subsume the revoked § 11(a) as it was in effect before 1962—is essentially merely "bootstrapping" argument that, if accepted across the board, would allow every effective date clause to bring its statute—even if clearly revoked—back to life.

If an effective date clause making a statute effective for the years following the statute's enactment must be read as incorporating by reference the terms of the statute to which it refers—*unless only* (as rarely, if ever, occurs) the act revoking the previous statute separately and expressly revokes the repealed statute's effective date clause—virtually *all* statutes would be preserved in perpetuity, because virtually *all* contain such an effective date clause and rarely, if ever, do later statutes expressly repeal the effective date clause of a previous statute on the same subject.

Further, any question as to the continued validity or effect of § 11(c)(1) must be resolved against plaintiffs, not only because, as taxpayers, they bear the burden of establishing that the government erred, but also because they rely on § 11(c)(1) to *exempt* them from taxation on their income. *See United States v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 1182, 99 L.Ed.2d 368 (1988) ("Exemptions from taxation are not to be implied; they must be unambiguously proved."); *Bank of Commerce v. Tennessee,* 163 U.S. 416, 423, 16 S.Ct. 1113, 1116, 41 L.Ed. 211 (1896) (upholding the rule that a "claim for exemption must rest upon language in regard to which there can be no doubt as to its meaning, and that the exemption must be granted in terms too plain to be mistaken").

III. *Survival or Reenactment of § 11(c)(1) of the 1962 Act*

Plaintiff reads the 1981 committee report's language set out earlier in this opinion as evidencing Congress' intent to preserve § 11(c)(1) of the 1962 Act.

Language in the legislative history alone, however, obviously cannot override the clear repeal of the 1962 Act in 1978. *Cf. United States v. Linker,* 920 F.2d 1, 2 (7th Cir.1990) (statement in Congressional Record to the effect that rights under repealed statute are not intended to be extinguished found "incongruous" because rights cannot survive statute's repeal in the absence of some sort of savings clause).[16]

Further, nothing in the 1981 committee reports themselves reenacts, or even purports to reenact, § 11(c)(1). They do not mention or allude to § 11(c)(1) of the 1962 Act, which, in any event, merely excluded "existing right income" (income to which a taxpayer had a right on March 12, 1962) from which *1962* amendment to § 911, contained a *$35,000* cap. Rather, the reports purport to exempt "existing right income" from application of the *new* § 911, containing a *$75,000* cap, enacted by the *1981* Act.

Thus, even if § 11(c)(1) remained in effect or was resuscitated by the reports, it would not support the outcome sought by plaintiffs, because under § 11(c)(1) of the 1962 Act, they could have exempted only $35,000, and not, as they did on their 1982 return, *$75,000,* from gross income.

There is no evidence in the 1962 Act and its legislative history that Congress intended in 1962 to exempt "existing right income" from *all* future caps on foreign earned income exclusion, without regard to the policies of future Congresses or to the increases in the ceilings for future exclusions. Nor could it so have limited future Congresses even if it want to. *See District of Columbia v. John R. Thompson Co.,* 346 U.S. at 106, 73 S.Ct. at 1011 (Congress "reserves right to revise, alter and revoke" statute).

---

**16.** 73 Am.Jur.2d *Statute of Frauds* § 425 (1974) ("[Revival by reference] ... general rule is that where a statute is repealed without reenactment of the repealed law in substantially the same terms, and there is no savings clause or a general statute limiting the effect of the repeal, the repealed statute, in regard to its operative effect, is considered as if it had never existed, *and reference in a legislative act to a repealed law ... has been regarded as an absurdity*" (emphasis added) (citations omitted)).

If the 1981 Committee reports are to be relied upon to do *more* than § 11(c)(1) did (*i.e.*, exclude existing right income from a cap higher than $35,000), the court must decide that the reports have legislative effect.

It is beyond serious dispute, however, that committee reports may not substitute for .properly enacted statutes and that unilateral congressional "intent" does not control the meaning of a statute. Unless a measure has been approved as required by the Constitution, by vote of both chambers of Congress and signature by the President (or by two-thirds of the votes of each House, to override presidential veto), it is not a law. *See INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (invalidating "legislative vetoes," *i.e.*, legislative actions not complying with constitutional requirements of bicameral vote and presentment to the President);[17] *see also Helvering v. City Bank Farmers Trust Co.,* 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62 (1935); *Caminetti v. United States,* 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917).

■ Committee reports, at best, provide only indicia of congressional intent, and may be referred to, if at all, only in instances where the statutory terms are ambiguous and thus the intent is unclear. *See Burlington N.R.R. Co. v. Oklahoma Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) ("Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete."). *But see* F. Frankfurter, *Reading of Statutes,* 47 Colum.L.Rev. 538 (1947) (quoting letters by Justice Holmes stating that he did not care what the legislature's intention was—"I only want to know what the words mean.").

Plaintiffs, however, point to no ambiguity in the 1981 Act justifying recourse to its legislative history, either in its amendments to § 911 or in any savings clause, effective date, or other provision.

Thus, the language in the legislative history of the 1981 Act purportedly evidencing congressional intent in 1981 *not* to repeal the pertinent grandfather clause cannot be relied upon to rebut the clear evidence of prior statutory repeal of that clause in 1978 by substitution of an entirely new scheme for reducing tax liability for foreign earned income and the *absence* of any such clause in the 1981 Act itself. *See Smietanka v. First Trust & Sav. Bank,* 257 U.S. 602, 42 S.Ct. 223, 66 L.Ed. 391 (1922) (under traditional rules of statutory construction, material omitted on reenactment is deemed repealed); *Independent Ins. Agents, Inc. v. Clarke,* 955 F.2d 731 (D.C.Cir.1922).

■ Where intentions of committees conflict with the express provisions of an existing law, these intentions cannot be read into a statute that is otherwise silent on the subject. *Cf. Demby v. Schweiker,* 671 F.2d 507, 510–12 (D.C.Cir.1981) (citing *TVA v. Hill,* 437 U.S. 153, 191, 98 S.Ct. 2279, 2300, 57 L.Ed.2d 117 (1978)).

To credit a committee report over the statute would elevate the narrow views of a legislative subgroup or of unelected congressional staff over the constitutional enactments of Congress and the President.[18] Committee reports provide scant evidence of even a probable or constructive legislative intent, because they are crafted by staff, not necessarily read by legislators, and are subject to packing via influence of interest groups and other legislative insiders. *See generally Hirschey v. FERC,* 777 F.2d 1, 7–8 & n. 1 (D.C.Cir.1985) (Scalia, J., concurring in the judgment); *see also In re Sinclair,* 870 F.2d 1340 (7th Cir.1989)

---

**17.** "The Constitution and the structure of the legislative process it establishes assume an approach to statutory interpretation that focuses on the actual rather than the intended meaning of the statutory text. This approach is implicit in the establishment of a bicameral legislature and in the requirement that bills be presented to the President and be subject to a qualified veto, in article I, § 7." *United States Dep't of Justice*

*Office of Legal Policy, Using and Misusing Legislative History: A Reevaluation of the Status of Legislative History in Statutory Interpretation* (1989).

**18.** *See generally* K. Starr, *Observations About the Use of Legislative History,* 1987 Duke L.J. 371, 376.

(Easterbrook, J.) (clear statutory language prevails over clear committee report language); *Abourezk v. Reagan,* 785 F.2d 1043, 1054–55 & n. 11 (D.C.Cir.1986) (Ginsburg, J.) ("In sum, we think it plainly wrong as a general matter ... to regard committee reports as drafted more meticulously and as reflecting the congressional will more accurately than the statutory text itself. Committee reports, we remind, do not embody the law."), *aff'd,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987).

It is clear that under the test in *Chadha,* the 1981 committee reports do not constitute a legislative "act." *Cf. Thompson v. Thompson,* 484 U.S. 174, 191–92, 108 S.Ct. 513, 522, 98 L.Ed.2d 512 (1988) (stating that committee reports are "frail substitutes for bicameral vote upon the text of a law and its presentment to the President, [and that i]t is at best dangerous to assume that all the necessary participants in the law enactment process are acting upon the same unexpressed assumptions") (Scalia, J., concurring in the judgment).

■ The constitutionally mandated role of a court is to "interpret the laws," as evidenced by the statutory language, rather than to "reconstruct legislative intentions." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 452–53, 107 S.Ct. 1207, 1223–24, 94 L.Ed.2d 434 (1987)[19]; *see also Harris v. Commissioner,* 178 F.2d 861, 864 (2d Cir. 1949), ("It is always a dangerous business to fill in the text of a statute from its purposes[;] ... it is utterly unwarranted unless the omission from, or corruption of, the text is plain."), *rev'd on other grounds,* 340 U.S. 106, 71 S.Ct. 181, 95 L.Ed. 111 (1950); *62 Cases of Jam v. United States,* 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566 (1951); *cf.* Michael Livingston, *Congress, the Courts and the Code: Legislative History and the Interpretation of Tax Statutes,* 69 Tex.L.Rev. 819, 823, 877 (1991) (distinguishing between *explanatory* and *quasi-regulatory* legislative history—only the former should be considered).

■ Even if the inclusion in the 1981 Act of the 1962 grandfather clause or of the language in the 1981 committee reports was "intended," and inadvertently omitted, by Congress, it clearly could not have been intended by the President, who presumably received an enrolled bill containing no such provision, and thus the language cannot be added by this court. *Cf. Iselin v. United States,* 270 U.S. 245, 250–51, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926), (Brandeis, J.) (when the statute evidently was drawn with care, and its language is plain and unambiguous, a court cannot supply omissions, because this "is not a construction of a statute but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope").

Further, it is not clear that Congress (as a body, not by committee) mistakenly omitted the provision, when Congress has never in the intervening eleven years made any effort at correction, *e.g.,* through reenactment of the grandfather clause, even in the face of regulations omitting reference to the 1981 Committee reports.

Under these circumstances, this court should not relieve Congress of its responsibility to say what it means in the only instrument in which it constitutionally may transmit that legislative intent—the bill it sends to the President for approval. *See Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988) (quoting *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978)) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change.").

*Conclusion*

Because §§ 11(a) and 11(c)(1) of the 1962 Act were repealed, by substitution and by self-extinguishment, respectively, and because this court cannot supply to the 1981 Act what was omitted by its drafters, neither § 11(c)(1) of the 1962 Act nor the three 1981 committee reports provide a basis for this court's jurisdiction over plaintiffs' com-

---

**19.** *See also* Holmes, *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417, 419 (1899) ("We do not inquire what the legislature meant; we ask only what the statute means.").

plaint under 28 U.S.C. § 1491(a). Accordingly, the clerk is directed to dismiss the complaint for lack of subject matter jurisdiction.